FILED

OCT 3 1 2011

United States Bankruptcy Court
San Jose, California

# UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re: | Case No. 07-52890-ASW |
| OLD T.B.R., INCORPORATED, f/k/a/ THE BILLING RESOURCE, dba INTEGRETEL, a California corporation, | Chapter 11 |
| Debtor. | |
| OLD T.B.R., INCORPORATED, f/k/a/ THE BILLING RESOURCE dba INTEGRETEL, | Adversary No. 09-5074 |
| Plaintiff, | |
| vs. | |
| THE BILLING RESOURCE, LLC, a Delaware limited liability company, | |
| Defendants. | |
| THE BILLING RESOURCE, LLC, a Delaware limited liability company, | |
| Counterclaimant, | |
| vs. | |
| OLD T.B.R., INCORPORATED, f/k/a/ THE BILLING RESOURCE dba INTEGRETEL, | |
| Counterdefendant. | |

**MEMORANDUM DECISION RE**
**THREE MOTIONS FOR SUMMARY ADJUDICATION**

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1    Before the Court are three motions for summary adjudication --

2    two filed by plaintiff Kerry Krisher, Liquidating Trustee as

3    successor to Debtor ("Liquidating Trustee") and one filed by

4    defendant The Billing Resource, LLC ("New TBR").  The three motions

5    seek summary adjudication as follows:

6    **First**, Liquidating Trustee and New TBR both seek partial

7    summary adjudication as to the ability of New TBR to charge Debtor

8    for accelerated dilutions -- the so-called "910 Account" -- related

9    to billing transactions submitted prior to the sale of Debtor's

10   operating assets to New TBR and which were still in "the pipeline"

11   at of the time of the sale.  The parties essentially have filed

12   cross-motions for summary adjudication relating to the

13   approximately $1.3 million charged by New TBR to Liquidating

14   Trustee relating to the "910 Account."

15   **Second,** Liquidating Trustee seeks partial summary adjudication

16   relating to New TBR's assertion that Debtor failed to turn over

17   control of certain 800 numbers in breach of the Asset Purchase

18   Agreement between New TBR and Debtor.

19   **Third,** New TBR seeks partial summary adjudication that the

20   amount which Liquidating Trustee does not contest is owed to New

21   TBR -- approximately $868,000 -- should be paid to New TBR now.

22   **Fourth,** New TBR asserts Debtor is required to reimburse New

23   TBR approximately $65,500 for a shortfall in the minimum amount

24   paid to Qwest Corporation ("Qwest") under two agreements with Qwest

25   which New TBR assumed as part of the sale of Debtor's operating

26   assets to New TBR.

27   **Fifth,** New TBR asserts Debtor is liable for "trailing

28   dilution" and "true-up charges" related to PaymentOne Corporation

("PaymentOne") in the approximate amount of $96,500 because PaymentOne is a non-Nelson Gross entity.

**Sixth**, New TBR requests interest on the amounts awarded to New TBR as well as a determination that New TBR is the prevailing party and is entitled to reimbursement of attorney fees and costs.

A lengthy hearing was held on June 28, 2011. The motions were submitted for decision after supplemental papers were filed with the Court. Liquidating Trustee is represented by Gail S. Greenwood, Esq. of Pachulski Stang Ziehl & Jones LLP. New TBR is represented by Kathryn S. Diemer, Esq. of Diemer, Whitman & Cardosi, LLP and John Greene, Esq. of Klein Zelman Rothermel LLP.

This Memorandum Decision constitutes the Court's findings of fact and conclusions of law, pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.

I.

FACTUAL BACKGROUND

Debtor filed a chapter 11 bankruptcy petition on September 16, 2007 as a result of litigation filed by the Federal Trade Commission against Debtor, two prior corporate customers of Debtor, and other defendants in the United States District Court for the Southern District of Florida. As part of Debtor's chapter 11 case, Debtor sold Debtor's assets and confirmed a liquidating chapter 11 plan. Liquidating Trustee succeeded to Debtor's rights in this litigation under Debtor's confirmed plan.

**A.  Debtor's Business Structure**

Debtor was a billing aggregator and provided billing-related and other services for smaller private telecommunications companies

that compete with local exchange carriers ("LECs") in niche areas such as public pay phones, hotels and prisons ("Alternative Operator Services"). Private telecommunications companies that provide Alternative Operator Services have difficulty billing for "collect" and other types of calls, since most individuals do not pay invoices from these unknown companies and those companies cannot bill the individuals through the individual's normal telephone bill. Debtor was created in 1988 to address this void in the marketplace. Debtor had billing and collection agreements with an estimated 1,400 LECs -- both major local exchange companies and numerous independents. Debtor's infrastructure permitted private telecommunications providers to incorporate such providers' charges into the phone bills of more than 90% of business and residential consumers throughout the United States and Canada.

An individual or entity who used the telecommunications services of an Alternative Operator Service ("End-User") provided information that would permit the Alternative Operator Service to charge the End-User's telephone bill for those telecommunication services. The Alternative Operator Service -- a customer of Debtor -- provided the End-User billing transaction information to Debtor in a data format acceptable to Debtor, as required by the typical service contract between Debtor and Debtor's customers.

Debtor bundled the End-User billing transaction information from Debtor's various customers by LEC as a Purchase of Accounts Receivable ("PAR"). Debtor submitted the various PARs to different LECs for processing. The LEC then included the Alternative Operator Service's charge on the End-User's bill. The End-User either paid or disputed the Alternative Operator Service charge.

If the End-User paid the charge, the LEC would pay Debtor as part of the PAR in which the End-User's billing transaction information was included. On a daily basis and throughout each day, the LECs made payments into Debtor's "wire in" account based on the PARs Debtor previously submitted to the LECs.

The service contracts with Debtor's customers provided that each week Debtor transfer by wire to Debtor's customers' bank accounts the net proceeds identified in the prior week as defined by the service contracts. The service contracts provided detailed formulas for computing the amounts Debtor owed to Debtor's customers. Both the LECs and Debtor withheld certain funds, including fees, unbillables (receivables that the LECs could not bill), uncollectibles, dilutions, adjustments and taxes, from the full amount of the customer's billing transaction.

Debtor's individual customers were identified by unique client numbers. Debtor captured the weekly customer settlement data in Settlement Statement History Reports ("Settlement Reports"), which were created for Debtor's individual customers and provided to the respective customer. Liquidating Trustee contends for the first time in Liquidating Trustee's Response to the Court's written comments ("Trustee's Response") filed on June 15, 2011 that under the service contracts, Debtor paid Debtor's customers for submitted call traffic approximately 90 days after the submission of the billing transaction, and generally before the LECs paid Debtor. Although there is no evidence in the record on the motions that such is the case, this contention is consistent with the service contracts between Debtor and Debtor's customers as well as the

Court's understanding of Debtor's business operations. It is unclear whether New TBR contests this contention.

Final reconciliation of the PARs submitted to the LECs could take as long as 20 months to complete. Debtor maintained certain reserves for disputes, fees and other adjustments which Debtor recorded as bookkeeping entries only. One of the general ledger accounts was the 910 Account.

### 1. The 910 Account

Pre-petition, Debtor "accelerated" dilution by charging dilution to Debtor's customers as soon as a LEC advised Debtor that a dilution could be expected. A LEC would inform Debtor that the LEC would dilute a certain batch of submitted PARs by a certain amount of money. Because the PARs related to several customers and Debtor did not know to which customer(s) the dilution related, Debtor used a formula to dilute the weekly settlement amounts to be paid to Debtor's customers whose accounts receivable were part of the PAR which the LEC was going to dilute. In order to keep track of the dilutions which Debtor had already charged to Debtor's customers, Debtor made an offsetting entry in the 910 Account. Thus, the 910 Account was essentially a general ledger account that reflects Debtor's financial position vis-a-vis the overall LEC transactions. In other words, the 910 Account captures the variance between (a) dilution that Debtor has billed to customers and (b) dilution that Debtor has been charged by LECs.

As a result of accelerated dilution, Debtor often withheld amounts from settlements with Debtor's customers on account of the accelerated dilution even though the corresponding charge from the LECs had not yet passed through to Debtor. The practical effect of

taking the accelerated dilution for Debtor was that Debtor essentially had a one-time cash flow benefit at the inception of acceleration by paying customers less than the customers were otherwise due on a given settlement. Once the LEC actually charged the dilution, Debtor attempted to true-up the prior projected customer dilution with the actual dilution using the information provided by the LECs' reconciliation of the PARs. Debtor would perform the client settlement true-up according to the service contract and would "zero out" the "910 Account" journal entry.

### 2. The 800 Numbers

LECs require that billing aggregators -- such as Debtor -- provide toll-free numbers with live customer service to End-Users to facilitate billing and other inquires from End-Users. LECs typically charge fees to billing aggregators in order to change the toll-free numbers that are printed on the End-Users' bills.

Debtor formed PaymentOne in 2000 as a wholly-owned subsidiary to address the specialized billing and support requirements of the internet. Debtor owned 97% of PaymentOne at the time Debtor filed Debtor's chapter 11 bankruptcy petition. In March 2006, Debtor contracted with PaymentOne for data processing and support services ("Data Processing Agreement"). The Data Processing Agreement included Debtor's use of certain 800 Numbers ("800 Numbers") for customer services and inquiry support. The 800 Numbers were provided to the LECs and printed on the telephone bills sent out by the LECs to the End-Users. There is no dispute that Debtor had been using the 800 Numbers for many years before March 2006.

Liquidating Trustee asserts that in January 2006, Debtor transferred all rights and interest in the 800 numbers to

PaymentOne, shortly before Debtor entered into the Data Processing Agreement with PaymentOne. New TBR disputes this contention and asserts that, as of the petition date, Debtor had control over the 800 Numbers, not PaymentOne.

**B. The Sale of the Operating Assets to New TBR**

Post-petition, New TBR acquired the assets that made up Debtor's billing services business ("Operating Assets") on a going concern basis as part of a sale under Bankruptcy Code section 363 ("Sale"). The Sale was approved by the Court pursuant to an order entered on October 16, 2008 ("Order"). As part of the Sale, Debtor and New TBR entered into an Asset Purchase Agreement ("APA") and a Master Services Agreement ("MSA"). These documents govern the obligations between the parties with respect to, inter alia, customer accounts, reserves and the billing pipeline.

**1. Post-Sale Relationships**

Debtor's business structure essentially had two separate, but interrelated, accounting processes. First, there was the settlement process between Debtor and Debtor's customers. To the extent Debtor paid Debtor's customers before the LECs paid Debtor on a respective PAR, Debtor "advanced" funds to Debtor's customers which Debtor then reconciled when Debtor received the funds from the LECs. The "Debtor-customer" accounting also included reconciliation of any "accelerated" dilutions from the 910 Account. The second accounting process was between Debtor and the LECs. Since each PAR typically involved billing transactions for more than one customer, Debtor accounted for funds paid by the LECs on account of the PARs, and then included that information in the settlement process with Debtor's customers. As noted above, the

"Debtor-LEC" accounting could take up to 20 months to reconcile in full.

The Sale interrupted both of these processes. Under Section 7.3 of the APA, Debtor was to receive all proceeds from billing transactions submitted to the LECs **prior to** the close of the Sale ("Retained Billing Transactions"). New TBR was to receive all proceeds from billing transactions submitted to LECs **after** the close of the Sale. Because the LECs had established procedures to transfer funds through Debtor's "wire-in" account, Debtor's "wire-in" account was transferred to New TBR upon the close of the Sale and Debtor no longer had access to the proceeds from the billing transactions. New TBR and Debtor entered into the MSA whereby New TBR agreed to service the Retained Billing Transactions for Debtor. Under the MSA, all amounts in the "wire-in" account were to be transferred to Debtor without deduction or offset for the first 32 days after the Effective Date of the Sale. Thereafter, New TBR was to forward to Debtor on a weekly basis all monies received by New TBR on account of the Retained Billing Transactions, less certain charges.

Also as part of the Sale, PaymentOne and New TBR entered into a Shared Support and Services Agreement as of October 31, 2008 ("SSSA"). PaymentOne and New TBR also entered into an amended Data Processing Agreement, as the Data Processing Agreement was assigned to New TBR under the APA.

**2. Post-Sale Litigation**

Disputes between New TBR and Debtor as well as between New TBR and PaymentOne arose post-Sale. Both New TBR and PaymentOne initiated lawsuits relating to both New TBR's assertion that the

1  800 Numbers belonged to New TBR as well as disputes regarding the

2  amounts due under the SSSA and the amended Data Processing

3  Agreement.  New TBR and PaymentOne settled all of their disputes as

4  of January 27, 2011.

5      Prior to New TBR and PaymentOne filing the litigation

6  referenced above, Debtor filed this lawsuit on March 18, 2009,

7  asserting that New TBR's failure to make payments to PaymentOne as

8  required under the MSA was impacting a proposed sale of Debtor's

9  interest in PaymentOne.  On August 31, 2009, Debtor filed an

10  amended complaint seeking a determination that Debtor did not need

11  to turn the 800 Numbers over to New TBR under the APA as well as

12  disputing the amounts New TBR charged Debtor under the MSA.  Debtor

13  also asserted claims for breach of contract and breach of the

14  implied covenant of good faith and fair dealing.  Liquidating

15  Trustee substituted in as plaintiff on September 18, 2009.  New TBR

16  filed an answer and counterclaim on September 30, 2009.

17  Liquidating Trustee filed an answer to New TBR's counterclaim on

18  October 20, 2009.  The parties subsequently filed the motions for

19  summary adjudication described above, which are currently pending

20  before this Court.

21

22                              II.

23                         APPLICABLE LAW

24      A motion for summary adjudication should be granted if there

25  is no genuine issue of material fact and the moving party is

26  entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a);

27  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  The

28  moving party bears the initial burden of informing the court of the

basis for the motion, and identifying portions of the pleadings, depositions, answers to interrogatories, admissions, or affidavits which demonstrate the absence of a triable issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

If the moving party meets its initial burden, the burden shifts to the non-moving party to present specific facts showing that there is a genuine issue of material fact for trial. Celotex, 477 U.S. at 324. The evidence and all reasonable inferences therefrom must be viewed in the light most favorable to the non-moving party. T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630-31 (9th Cir. 1987). The nonmoving party has a duty to present affirmative evidence in order to defeat a properly supported motion for summary adjudication. Anderson, 477 U.S. at 257. Summary adjudication is not appropriate if the non-moving party presents evidence from which a reasonable jury could resolve the disputed issue of material fact in his or her favor. Anderson, 477 U.S. at 248; Barlow v. Ground, 943 F.2d 1132, 1136 (9th Cir. 1991).

III.

ANALYSIS

A.   910 Account

Regarding the cross-motions for summary adjudication relating to the 910 Account, New TBR and Liquidating Trustee have different interpretations of the APA and MSA. The Court can resolve this dispute based on the language of these documents for three reasons. First, the parties do not believe that either the APA or MSA is ambiguous. Second, Section 8.5 of the APA contains an express

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

integration clause which provides in relevant part that the terms
of the APA "supersede and cancel all prior agreements,
negotiations, correspondence, undertakings, understandings and
communications of the parties, oral and written, with respect to
the subject matter hereof or thereof." APA, Section 8.5. Third,
the parties have uniformly testified that there were no discussions
regarding the 910 Account, or the concept of "balancing out" the
ledger account prior to the Sale.

In analyzing the parties' papers, the Court has discovered a
factual premise on which the parties disagree, and for which the
Court finds no evidentiary support in the papers filed with these
motions. Specifically, Liquidating Trustee asserts in Trustee's
Response that:

> Generally speaking, TBR [Debtor] paid its clients for the
> submitted call traffic before the LECs had paid TBR.
> When the LECs did pay, they did so based on a PAR
> ("Purchase of Accounts Receivable"). TBR would then
> reconcile the PAR with what they expected to receive from
> the LEC.

Trustee's Response at 5:9-12. This assertion is consistent with
the service contracts between Debtor and Debtor's customers as well
as the Court's understanding of how Debtor conducted Debtor's
business. However, there is no evidentiary support in the record
in these motion papers for Liquidating Trustee's statement.

New TBR's argument assumes that any accelerated dilution is a
windfall for Debtor and that Debtor would be unable to charge
Debtor's customer subsequently for the alleged one-time cash flow
benefit Debtor received at the inception of the acceleration.
However, that may not be the case. If Debtor generally paid
Debtor's customers before the LECs paid Debtor, then an accelerated

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

dilution is not necessarily the windfall for Debtor that New TBR

asserts.  Rather, the accelerated dilution would be a credit to

Debtor for the monies Debtor already advanced to Debtor's customer,

and for which the customer would subsequently be liable when Debtor

subsequently reconciled the PAR payment.  To the extent that

Debtor's customer is ultimately liable for an accelerated dilution

rather than Debtor, under this Court's interpretation of the APA

and the MSA, New TBR should not charge Debtor.  In an effort to

further this litigation, the Court will explain how the Court

construes the APA and MSA and let the parties analyze further

whether New TBR's charges for the 910 Account comport with the

Court's interpretation.

Liquidating Trustee asserts that under Section 1.7 of the APA,

New TBR acknowledged that the Sale was "as is" and without any

representations.  Section 1.7 provides:

> PURCHASER ACKNOWLEDGES AND AGREES THAT, EXCEPT AS
> OTHERWISE MAY BE EXPRESSLY PROVIDED HEREIN, SELLER MAKES
> NO REPRESENTATIONS OR WARRANTIES OF ANY KIND, EXPRESS OR
> IMPLIED, WITH RESPECT TO THE OPERATING ASSETS OR ANY
> OTHER MATTER WHATSOEVER, INCLUDING, WITHOUT LIMITATION,
> INCOME TO BE DERIVED OR EXPENSES TO BE INCURRED IN
> CONNECTION WITH THE OPERATING ASSETS, THE PHYSICAL
> CONDITION OF THE OPERATING ASSETS, THE VALUE OF THE
> OPERATING ASSETS, THE TERMS, AMOUNT, VALIDITY OR
> ENFORCEABILITY OF ANY ASSUMED LIABILITIES, THE
> MERCHANTABILITY OR FITNESS OF THE OPERATING ASSETS FOR
> ANY PARTICULAR PURPOSE, OR ANY OTHER MATTER OR THING
> RELATING TO THE OPERATING ASSETS.  WITHOUT IN ANY WAY
> LIMITING THE FOREGOING, SELLER HEREBY DISCLAIMS ANY
> WARRANTY, EXPRESS OR IMPLIED, OF MERCHANTABILITY OR
> FITNESS OF THE OPERATING ASSETS FOR ANY PARTICULAR
> PURPOSE.  PURCHASER FURTHER ACKNOWLEDGES THAT PURCHASER
> HAS CONDUCTED AN INDEPENDENT INSPECTION AND INVESTIGATION
> OF THE OPERATING ASSETS AND ALL SUCH OTHER MATTERS
> RELATING TO OR AFFECTING THE OPERATING ASSETS AS
> PURCHASER DEEMED NECESSARY OR APPROPRIATE AND THAT IN
> PROCEEDING WITH ITS ACQUISITION OF THE OPERATING ASSETS,
> EXCEPT FOR ANY REPRESENTATIONS AND WARRANTIES EXPRESSLY
> SET FORTH HEREIN, PURCHASER IS DOING SO BASED SOLELY UPON
> SUCH INDEPENDENT INSPECTIONS AND INVESTIGATIONS.
> ACCORDINGLY, EXCEPT AS EXPRESSLY SET FORTH ELSEWHERE

MEMORANDUM DECISION RE THREE
MOTIONS FOR SUMMARY ADJUDICATION          13

1    HEREIN, PURCHASER WILL ACCEPT THE OPERATING ASSETS AT THE
     CLOSING "AS IS," "WHERE IS," AND "WITH ALL FAULTS."

2

3  APA, Section 1.7.  New TBR counters that Section 1.7 of the APA is

4  not applicable because the "AS IS" clause is qualified by the

5  phrase "EXCEPT AS OTHERWISE MAY BE EXPRESSLY PROVIDED HEREIN" in

6  two respects.  First, Section 1.2 of the APA provides that Debtor

7  shall be responsible to New TBR for liabilities and obligations

8  under the LEC Agreements prior to the Effective Time.  Section 1.2

9  of the APA provides in relevant part:

10     Seller [Debtor] shall be responsible to Purchaser [New
       TBR] as provided in the LEC Servicing Agreement [the MSA]
11     entered into by the parties and attached hereto as
       Exhibit E for liabilities and obligations arising under
12     the LEC Agreements prior to the Effective Time.

13  APA, Section 1.2.  Second, Section 7.3 of the APA provides that

14  Debtor's rights to the funds received on account of the Retained

15  Billing Transactions are subject to New TBR's rights under the MSA.

16  Section 7.3 of the APA provides in relevant part:

17         The parties agree that all funds received on account
       of Billing Transactions submitted to Telcos [LECs], as
18     those terms are defined in the LEC Servicing Agreement
       [the MSA], prior to the Effective Time ("Seller's
19     Pipeline Funds") belong to Seller [Debtor], subject to
       Purchaser's [New TBR's] rights set forth in the LEC
20     Servicing Agreement.

21  APA, Section 7.3.  The Court agrees with New TBR that the "AS IS"

22  clause of Section 1.7 of the APA is qualified by Sections 1.2

23  and 7.3 of the APA.  Thus, the issue to be analyzed is what are New

24  TBR's rights under the MSA in the Retained Billing Transactions.

25     According to New TBR, under Section 2 of the MSA, Debtor or

26  Debtor's customers remain responsible for all costs and expenses

27  directly or indirectly related to the Retained Billing

28  Transactions.  Section 2 of the MSA provides in full:

**2. NEWCO SERVICES.** NEWCO [New TBR] shall provide the following services (each a "Service Order") as more fully described on the referenced Schedules, attached hereto and made a part hereof.

| Sched # | Service Order Options | Included |
|---------|----------------------|----------|
| II | PhoneBill Services (Telco [LEC] Billing) | (**X**) |
| VI | End-User Inquiry (required with Service Order II or III) | (**X**) |

Client [Debtor] and/or Integretel [Debtor] Clients shall remain responsible for any and all costs and expenses directly or indirectly related to Billing Transactions submitted to the LECs prior to the Effective Date of this Agreement, including, but not limited to Unbillables, Adjustments, Uncollectibles and Other Deductions.

MSA, Section 2. New TBR asserts that the "accelerated" dilutions referenced in the 910 Account are indirect costs related to the Retained Billing Transactions and are the responsibility of Debtor or Debtor's customers. Liquidating Trustee asserts that any accelerated dilutions referenced in the 910 Account are already accounted for in the client settlement system and the 910 Account is simply a reminder of how much unreconciled dilution has already been passed down to Debtor's customers.

New TBR asserts that Sections 5 and 6 of Schedule II of the MSA allow New TBR to recover amounts attributable to the deceleration of dilution based on Debtor's prior "accelerated" dilution. Sections 5 and 6 provide in full:

**5. OTHER DEDUCTIONS.**

a) Telco [LEC] Fees. NEWCO [New TBR] shall be entitled to recover all Telco-imposed processing and other charges associated with Integretel [Debtor] Clients' Billing Transactions ("Telco Fees").

b) Client Reserve. Client [Debtor] may withhold and maintain, from amounts otherwise due to Integretel Clients, reasonable reserves to protect Client from credit losses with respect to such Integretel Clients provided that, if NEWCO and Client mutually agree in

**6. SETTLEMENT OF AMOUNTS DUE.** (a) Client shall be entitled to all amounts collected from the TELCOs on Integretel Clients' Billing Transactions submitted to the TELCOs prior to the Effective Date ("Settled Amounts"), less any amounts due and owing to NEWCO, or which NEWCO is entitled to withhold, hereunder including, without limitation, Unbillables, Adjustments, Telco Holdbacks, excess Uncollectibles (pursuant to any True-Up), Taxes, Fees and Telco Fees (such difference being the "Net Proceeds"). For the first 32 days after the Effective Date, all Settled Amounts shall be transferred without deduction or offset to Client's designated account, as provided in the APA. Thereafter, all Settled Amounts shall be paid to NEWCO and NEWCO shall transfer each week, by wire to Client's, or at Client's written request, to Integretel's Client's bank accounts, the Net Proceeds identified the prior week.

(b) In the event that the calculation of Net Proceeds yields a negative amount for an Integretel Client, NEWCO shall invoice Client for such negative amount and Client shall, within five (5) business days, reimburse such negative amount to NEWCO out of the funds held in the Disbursement Reserve or other Client funds. However, in the event that no funds remain in the Disbursement Reserve attributable to a particular Integretel Client and either (i) NEWCO has notified Client not to withhold reserve amounts with respect to such Integretel Client or (ii) the Integretel Client is an Affiliate (as defined in the APA) of NEWCO, then NEWCO shall offset such negative amounts from amounts otherwise due directly from NEWCO to such Integretel Client or collect such negative amount from such Integretel Client and not from Client.

(c) The parties shall work in good faith to inform each other and reconcile the amounts due to/from each Integretel Client. Client may reduce the amount held in the Disbursement Reserve by any amounts withheld from Settled Amounts by NEWCO for Telco True-ups and by any amounts paid to NEWCO under this Section 6 from the Disbursement Reserve.

MSA, Schedule II, Sections 5 and 6. Liquidating Trustee asserts that the amount New TBR can charge the bankruptcy estate is limited

to those charges allowed under MSA, Schedule II, Section 6(b) (quoted above) only.

Under Section 7.3 of the APA, Debtor is to receive all proceeds from the billing transactions submitted to the LECs **prior to** the close of the Sale and New TBR is to receive all proceeds from billing transactions submitted to the LECs **after** the close of the Sale. If prior to the Sale, Debtor had withheld settlement funds from a customer based on an indication from a LEC that there would be a future dilution to a Retained Billing Transaction, Debtor would have allocated the future dilution to the weekly settlement for that customer and reduced the settlement proceeds accordingly. To the extent that Debtor had previously "advanced" settlement funds to that customer, the accelerated dilution merely "repaid" Debtor for those advances, for which the customer would have been responsible in any event. Debtor would have accounted for the accelerated dilution in the 910 Account.

Assume for a moment that the Sale had not taken place. If there had been no Sale, when the LEC eventually paid the PAR, Debtor would have reconciled the accelerated dilution with the actual dilution, made an appropriate adjustment to the customer's weekly Settlement Report, and made an appropriate adjustment to the 910 Account. Now assume that the PAR had not yet been paid on the date of the Sale. As of the Sale, there would have been an entry for the accelerated dilution in the 910 Account and an accelerated dilution withheld from the customer. When the LEC paid the PAR post-Sale, the LEC would have withheld monies on account of the dilution from the monies paid to New TBR. According to New TBR, because the withheld funds relate to a Retained Billing

MEMORANDUM DECISION RE THREE
MOTIONS FOR SUMMARY ADJUDICATION          17

Transaction, either Debtor or Debtor's customer is responsible for the monies withheld by the LEC, not New TBR.  This is consistent with the language of Section 7.3 of the APA.  New TBR then asserts that under Section 2 of the MSA, and because Debtor had previously withheld monies on account of the accelerated dilution, Debtor -- not Debtor's customer -- should be responsible for paying the monies previously withheld on account of the accelerated dilution.  According to New TBR, New TBR has withheld the amounts diluted by the LEC from monies to be paid to Debtor as a reduction from the "910 Account" on New TBR's invoice.

However, New TBR's analysis does not account for Debtor's alleged general practice of advancing payments on billing transactions to Debtor's customers **before** Debtor received funds from the LECs.  For example, assume Debtor advanced funds on a Retained Billing Transaction submitted by one of Debtor's customers and the PAR, which included that Retained Billing Transaction, remained unpaid as of the Sale.  When the PAR is paid post-Sale by the LEC, and if the LEC payment includes a dilution on which Debtor had taken a pre-Sale accelerated dilution, it should be the customer -- not Debtor -- who is responsible for any and all costs and expenses related to that Retained Billing Transaction up to the point of any unpaid advance.  This is because when Debtor advanced funds to the customer pre-Sale and then subsequently applied a dilution, the dilution offset the amount the customer owed Debtor for the advanced funds.  New TBR's analysis assumes that all accelerated dilutions were gains to Debtor and that there were no amounts which a customer owed to Debtor at the time of an

1  accelerated dilution to which Debtor could apply an offset.  This
2  assumption is likely not correct.

3     It is not readily apparent that New TBR's invoicing for the
4  910 Account takes into account Debtor's alleged general practice of
5  advancing funds to Debtor's customers.  Accordingly, at this time,
6  the Court will not determine whether the bankruptcy estate is
7  liable for the 910 Account charges and, if so, in what amount.

8  **B.  800 Numbers**

9     Liquidating Trustee seeks a determination that Liquidating
10 Trustee had no obligation to transfer the 800 Numbers to New TBR as
11 part of the Sale and, therefore, Liquidating Trustee is not liable
12 for any alleged damages based on Debtor's alleged failure to
13 transfer the 800 Numbers to New TBR.  Through the briefing on this
14 matter, both parties now agree that 800 numbers are tariffed
15 numbers which cannot be owned by an entity under rulings of the
16 Federal Communications Commission.  As explained by New TBR, 800
17 numbers are managed by responsible organizations ("resporgs").  If
18 an entity seeks to re-provision an 800 number -- _i.e._, transfer the
19 800 number from one billing organization to another under the
20 portability doctrine -- the resporg is the entity to which such a
21 request is made.  Qwest, with which Debtor had an existing
22 relationship, was the resporg for the 800 Numbers published on the
23 LEC bill pages with whom Debtor had the right to place charges.

24    This 800 Number dispute arose when Nelson Gross -- on behalf
25 of New TBR -- sent a provisioning request to Qwest to transfer the
26 800 Numbers to Global Crossing -- a different resporg -- and that
27 request was blocked because PaymentOne claimed to control the 800
28 Numbers.  Ultimately, PaymentOne permitted the transfer of the 800

1  Numbers under the settlement agreement between New TBR and

2  PaymentOne, and the 800 Numbers have been transferred to New TBR.

3      The central issue is what -- if any -- rights to the 800

4  Numbers Debtor had at the time that Debtor sold the Operating

5  Assets to New TBR.  According to Liquidating Trustee, in January

6  2006 -- prior to filing for bankruptcy, Debtor transferred all of

7  Debtor's rights and interest in the 800 Numbers to PaymentOne,

8  shortly before Debtor entered into the Data Processing Agreement

9  with PaymentOne in March 2006.  Liquidating Trustee relies on the

10 following evidence to support Liquidating Trustee's interpretation

11 that the 800 Numbers were controlled by PaymentOne.  First, the

12 Data Processing Agreement which provides that "800 toll free

13 numbers shall be supplied by PAYONE [PaymentOne] at it's (sic) own

14 expense."  Data Processing Agreement, Schedule 2.1, Section B-1,

15 Paragraph 8.

16     Second, Ken Dawson, one of the co-founders of Debtor and

17 former president as well as a member of the board of directors for

18 nearly 20 years, testified in deposition that at some point pre-

19 petition, Debtor outsourced Debtor's customer inquiry

20 responsibilities to PaymentOne.  At the time of the outsourcing,

21 PaymentOne was Debtor's wholly-owned subsidiary.  Debtor

22 transferred control and/or responsibility of the 800 Numbers to

23 PaymentOne because the underlying vender who provided the inquiry

24 services to PaymentOne needed control over the 800 Numbers.

25 According to Mr. Dawson's deposition testimony, when Debtor

26 transferred control, Debtor transferred to PaymentOne the

27 management, billing, payment, service ordering, and ability to

28 change carriers -- essentially, whatever was needed to keep the 800